# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

EUGENE M. CHAPMAN,          )
                                   )
            Plaintiff,            )
                                   )
          v.                   )     Cause Number: 1:06-CV-84 TS
                                   )
ESSEX GROUP, INC.,           )
                                   )
            Defendant.       )

## OPINION AND ORDER

**A.**    **Background**

The Plaintiff, Eugene Chapman, an African-American man, was employed by the Defendant, Essex Group. On April 4, 2005, the Plaintiff filed a charge with the Equal Employment Opportunity Commission (EEOC), alleging that the Defendant was discriminating against him on the basis of his race when it gave him a disciplinary final warning letter. The EEOC issued a right-to-sue letter on November 3, 2005.

On November 21, 2005, the Defendant fired the Plaintiff for insubordination and harassment and intimidation of other employees. Convinced that the firing was racially motivated and in retaliation for his complaining about the presence of racism at work, the Plaintiff sued the Defendant under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. The Plaintiff claims that the Defendant discriminated against him on the basis of his race, racially harassed him, and retaliated against him when he complained. The Plaintiff also alleges that the Defendant violated his rights under the Family Medical Leave Act. After a period of discovery, the Defendant moved for summary judgment on all of the Plaintiff's claims. The

parties have briefed the issues raised, and the motion is ripe for ruling. For the reasons stated

below, the Court will grant the Defendant's motion.[1]


**B.       Summary Judgment Standard**

The Federal Rules of Civil Procedure mandate that motions for summary judgment be

granted "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule

56(c) further requires the entry of summary judgment, after adequate time for discovery, against

a party "who fails to make a showing sufficient to establish the existence of an element essential

to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate—in fact, is

mandated—where there are no disputed issues of material fact and the movant must prevail as a

matter of law. In other words, the record must reveal that no reasonable jury could find for the

non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th

Cir. 1994) (citations and quotation marks omitted). "'Only disputes over facts that might affect

the outcome of the suit under the governing law will properly preclude the entry of summary

judgment. Factual disputes that are irrelevant or unnecessary will not be counted.'" *Abrams v.*

*Walker*, 307 F.3d 650, 653 (7th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 248 (1986)).

---

[1]Summary judgment as to the Plaintiff's Family Medical Leave Act claim is granted outright because the Plaintiff has conceded in his responsive brief that he has no claim under this Act. Accordingly, this Opinion and Order addresses only § 1981 and Title VII claims.

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Federal Rule of Civil Procedure 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Anderson*, 477 U.S. at 248–50. Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Juarez v. Ameritech Mobile Comm'ns, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992). Conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment. *Haywood v. N. Am. Van Lines, Inc.*, 121 F.3d 1066, 1071 (7th Cir. 1997).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe*, 42 F.3d at 443. However, under Northern District of Indiana Local Rule 56.1(b), the Court is to assume that the facts claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent such facts are

controverted in a "Statement of Genuine Issues" filed in opposition to the motion and supported by admissible evidence. The controverted facts must be set forth "with appropriate citations to discovery responses, affidavits, depositions, or other admissible evidence." L.R. 56.1(a).

**C.      Facts**

The Defendant has a manufacturing plant in Fort Wayne, Indiana, where the Plaintiff was employed as an enamel operator. The Plant processes copper rod spools into wire. The Plaintiff's job was to feed copper wire into a machine that covered the wire with an enamel coating. The Plaintiff worked for the Defendant from February 3, 1997, until he was fired on November 21, 2005.

At the beginning of 2005, the Plaintiff's direct supervisor was Terry Derickson. Sometime in the summer 2005, Rick Vergara replaced Derickson. Vergara reported to Thomas Smead, the Plant Manufacturing Manager, who in turn reported to Jesse James, the Plant Manager. Smead referred all suspected disciplinary infractions to Stephen Heggen, the Human Resources Manager, for investigation. Smead himself had no input into disciplinary decisions. Disciplinary decisions were made by Heggen and James with consultation from Ron Bortner, the Division Human Resources Manager.

During his employment with the Defendant, the Plaintiff had a steady stream of work related counseling. The counseling became more frequent in 2002, when the Plaintiff was also given several written warnings for failure to carry out his tasks as required. In June 2003, the Defendant terminated the Plaintiff for refusing to do assigned work or carry out a reasonable order of a management representative. The Plaintiff, a union member, filed a grievance regarding

his termination. In order to resolve the grievance, the company agreed to reinstate the Plaintiff's employment. However, the union representative agreed that the Plaintiff had violated company rules and, on behalf of the Plaintiff, agreed to a thirty-seven-day suspension without pay for his misconduct.

On August 12, 2003, Heggen, Smead, Derickson, and Union Steward Willie Hamilton met with the Plaintiff. The meeting was called because the Plaintiff was agitated and repeatedly accused his supervisor of harassment. The managers wanted to address the Plaintiff's complaints. The notes from the meeting show that Smead was concerned that the Plaintiff kept accusing his supervisor of harassment but was not following the proper channels for filing a complaint. Smead worried that the Plaintiff's behavior disrupted the work environment and advised him to file a complaint if he believed that he was being treated wrongly. The Plaintiff told everyone present that he had calmed down and that he did not feel that he was being harassed. Smead insisted that an investigation needed to be conducted if the Plaintiff was being harassed, but the Plaintiff continually assured everyone that everything was fine. The Plaintiff affirmed that, if he did feel that he was being harassed, he would inform the management. At the end of the conversation, Union Steward Hamilton encouraged the Plaintiff to bring his complaints to the management and cooperate with them. (Pl. Ex. 25; DE 29.)

On November 25, 2004, Derickson met with the Plaintiff because two white employees claimed that the Plaintiff made some racial comments to them. They complained that the Plaintiff said they did not want to help out the Plaintiff's "brother," an African American employee named James Walker. (Pl. Ex. 19; DE 23.) The Plaintiff denied that he made any comments and said that he did not have problems with anyone in the enamel room. Derickson

told the Plaintiff that racial remarks were not allowed at work. The Plaintiff said that he understood.

On March 9, 2005, Derickson gave the Plaintiff a final written warning for welding the wrong size wires.

On March 22, 2005, the Plaintiff saw a doctor and told him that he had "lots of stress in life." (Pl. Ex. 4; DE 4.) He also said that his "employer [was] not treating him fair," that he was anxious and was not getting enough sleep. (*Id.*)

On April 4, 2005, the Plaintiff filed against the Defendant a racial discrimination charge with the EEOC. In the charge, the Plaintiff complained that he received a final written warning on March 9 for welding the wrong size wires, while six white employees, who have committed the same offense, have not been reprimanded. On November 3, 2005, the EEOC finished investigating the Plaintiff's complaint and issued a right-to-sue letter.

On September 21, 2005, the Plaintiff sent a complaint letter to the Defendant. In the letter, he stated that he was "being discriminated and harassed against by Tom Smead and Steve Heggen." (Pl. Ex. 2.) He felt that Smead and Heggen were scrutinizing him more than white employees, and that they wanted him fired. According to him, Smead and Heggen allowed white employees to "break the attendance policy, break the shop rules, sleep on the job, run loose lbs of scrap" but were willing to terminate his employment even though he did things right. (*Id.*) He equated Smead and Heggen's actions to hate crimes and requested that they be stopped from harassing him. The Plaintiff also called for federal investigation into their practices. (*Id.*)[2]

---

[2]With his exhibits, the Plaintiff also submitted an undated letter to the Defendant in which he complains of racial disparity. Although the subject matter of the letter indicates that it was written sometime after March 9, 2005, the Plaintiff provides no information as to its approximate date.

On Friday, November 11, 2005, Bob Millet, John Kleifgen, and David McCoy decided among themselves to order pizza for lunch. When pizza arrived, Millet approached the Plaintiff and asked him if his wife made him lunch. The Plaintiff answered in the affirmative at which Millet said: "Well, that's good. We all ordered pizza. So you better go ahead and eat your wife's lunch because I don't want her to get mad at you." (Chapman Dep. at 105.) Millet then left the Plaintiff and joined Kleifgen and McCoy to eat the pizza.

The Plaintiff immediately went to Vergara to complain about being left out. He told Vergara that Millet, Kleifgen, and McCoy were not being team players and that all employees should have been included in their pizza lunch. The Plaintiff did not attribute his exclusion to racial animus. (Chapman Dep. at 95–96, 119.)

That same day, several employees complained to Vergara that the Plaintiff was harassing and intimidating them and others by making remarks about pizza. They also complained that the Plaintiff was accusing them of being racists. At the direction of Smead, Vergara called a meeting of the shift employees. The Plaintiff also attended the meeting. At the meeting, Vergara told the employees to stop talking to each other about the pizza incident and to stop making racial accusations. However, over the next two days, the employees kept complaining to Vergara that the Plaintiff continued his disruptive behavior. As a result, Vergara suspended the Plaintiff on Sunday, November 13.

Having learned of the complaints against the Plaintiff, Heggen began an investigation. He interviewed the Plaintiff, Millet, Kleifgen, McCoy, and Vergara. He also interviewed Rob Medsker, the lead man working the night the employees ordered pizza, and John Langdon, Jose Navarro, Doug Watkins, and Mike Smith, the other employees who also were working that

night. Over the course of the investigation he learned the following:

1.     None of the employees Heggen interviewed corroborated the Plaintiff's claim that Millet did not allow the Plaintiff to eat pizza with them. Rather, they told Heggen that Millet asked the Plaintiff whether he wanted to eat pizza, but the Plaintiff declined. They said that the Plaintiff admitted to them that he was asked to join in, but declined because of the manner in which he was asked. Specifically, the Plaintiff was upset with Millet's prefacing the invitation with the presumption that he would rather eat his wife's lunch than the pizza. (Heggen Decl. ¶23.)

2.     Vergara told Heggen that the employees complained about being harassed by the Plaintiff over being excluded from the pizza lunch. The Plaintiff was calling them racists and was disrupting the workplace. At the direction of Smead, Vergara met with all of the shift employees on November 11. At the meeting, during which the Plaintiff was also present, Vergara told everyone to stop talking to each other about pizza and to stop making racial accusations.

3.     Vergara also told Heggen that the next day, November 12, Vergara kept receiving complaints from employees that the Plaintiff called several co-workers racists and that the Plaintiff stated that Kleifgen did not need the Plaintiff's help because the job was a "white thing." (Heggen Decl. ¶28.)

4.     Millet told Heggen that Doug Watkins brought some food to share on November 12 and that the Plaintiff kept trying to provoke Millet by saying, "See how people share, Bob." Millet did not respond but stopped working and complained to Vergara about the Plaintiff's behavior. (Heggen Decl. ¶29.)

5.     Kleifgen told Heggen that the Plaintiff tried to provoke him on November 12 by continually saying, "Hey, man, look what I'm eating." When Kleifgen turned away and refused to look, the Plaintiff walked up behind him and whispered in his ear menacingly, "You better get that racist shit out of your heart, you racist ass." Kleifgen felt very threatened and intimidated and immediately complained to Vergara. (Heggen Decl. ¶31.)

6.     Kleifgen also told Heggen that on the evening of November 11, the Plaintiff was trying to provoke him by throwing his arms apart and saying, "Don't be mad at me; give me a hug." (Heggen Decl. ¶33.) McCoy corroborated Heggen's story. (Heggen Decl. ¶34.)

7.     On November 13, Langdon told Heggen that the Plaintiff called Kleifgen and Millet racists and that Langdon reported that fact to Vergara. Langdon also told Heggen that, on November 13, he and the Plaintiff were sweeping an area and the Plaintiff said to him, "This isn't so bad, we can have pizza." After they finished sweeping, McCoy thanked the Plaintiff to which he responded aggressively, "Is that all I get from you? Don't I get any pizza?" McCoy complained to Vergara about the Plaintiff's conduct. (Heggen Decl. ¶36.)

On November 16, Heggen, along with Plant Manager James, Larry Foster, and Chuck Ellis,[3] had a meeting with the Plaintiff. Heggen asked the Plaintiff if he knew why Vergara had suspended him. The Plaintiff answered, "No, I really don't. Because I said the word pizza, that's all I could come up with." (Pl. Ex. 14.) Heggen recounted the complaints but the Plaintiff brushed off the allegations. The Plaintiff said he was puzzled why Vergara called a meeting on Friday and why he told everyone not to make racial comments. He said he understood that racial

---

[3]Neither party identifies Foster's and Ellis's positions.

comments from anyone had to stop but insisted that the allegations that he was making racial comments about the white employees were lies.

Heggen reported his investigation findings to Plant Manager James and Division Human Resource Manager Bortner. The three spoke several times and concluded that the Plaintiff repeatedly harassed and intimidated his co-workers even though he had been told to stop, and that his misconduct warranted termination.

On November 21, 2005, Heggen sent a letter to the Plaintiff informing him that he "[u]pon investigation and review of the circumstances and events of the dates noted, the company has determined that you were in violation of one or more shop rules and in violation of the company's anti-harassment policy." (Pl. Ex. 24.) The letter then stated that the Defendant terminated the Plaintiff's employment. The Plaintiff's job performance was not an issue in the termination decision.

The Plaintiff testified at his deposition that, during the entire nine years he worked for the Defendant, no one had ever made a single racist comment about the Plaintiff or about African Americans in general. In fact, with the exception of one co-worker's complaint about Mexicans, the Plaintiff had never heard anyone make racial slurs or any racial remarks. (Chapman Dep. at 166–67.)

**D.     Discussion**

In this suit, the Plaintiff alleges that the Defendant created a racially hostile work environment, discriminated against him on the basis of his race, and retaliated against him when

he complained about these wrongs, all in violation of Title VII and 42 U.S.C. § 1981. The legal

analysis under both statutes is identical. *Anders v. Waste Mgmt. of Wis.*, 463 F.3d 670, 675 (7th

Cir. 2006). However, in this case § 1981 is far more reaching than Title VII. The latter has a

180-day statute of limitations from the date of an alleged wrong within which an employee must

file an EEOC charge against the offending employer. Moreover, only those charges that were

listed in the EEOC complaint can be maintained in a federal cause of action. Therefore, under

Title VII, the Plaintiff can pursue only his discrimination claim arising out of the March 9, 2005,

written warning, the only claim listed in the EEOC charge.

On the other hand, § 1981 has a four-year statute of limitations and does not require an

administrative complaint process before a party can be sued. As a result, an action under § 1981

not only includes the Plaintiff's Title VII claim, but also covers claims arising between February

2, 2002, and November 21, 2005.

Section 1981 guarantees equality in making and enforcing contracts for persons of all

races: "All persons within the jurisdiction of the United States shall have the same right in every

State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." § 1981(a).

The statute defines "making and enforcing contracts" as "the making, performance,

modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms,

and conditions of the contractual relationship." § 1981(b).

The courts have interpreted § 1981 to prohibit workplace racial discrimination,

harassment, and retaliation. *See Thanongsinh v. Board of Educ.*, 462 F.3d 762, 782 (7th Cir.

2006) ("Like Title VII, section 1981 prohibits [racial] discrimination against an employee.");

*Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 271 (7th Cir. 2004) (listing elements of

11

harassment under § 1981); *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 397 (7th Cir. 2007) ("We Hold that Section 1981 Protects Against Retaliation."). An employee may prove that an employer violated § 1981 under either the direct or indirect method of showing of wrongful treatment. In this case, the Plaintiff has chosen the direct method for all of his three claims.

**(1)    *The Plaintiff's Racial Discrimination and Harassment Claim***

The Plaintiff insists that he has enough circumstantial evidence to show under the direct method of the prima facie case that he was a victim of racial discrimination and harassment at work. He maintains that, beginning in 2002, his superiors were treating him disparately by subjecting him to frequent scrutiny and criticism while giving a pass to white employees. He states that he received warning letters but saw no similar action taken against white employees who engaged in the same conduct. The Plaintiff also claims that his employment was terminated because of his race. The Plaintiff does not argue that the June 2003 suspension was racially motivated.

In addition, the Plaintiff asserts that he was continually harassed on the basis of his race. He believes that his exclusion from eating pizza with Millet, Kleifgen, and McCoy is just one example of such treatment. The Plaintiff maintains that the Defendant racially harassed him by scrutinizing his work more than the work of the white employees. He contends that the notes from his doctor attest to the harassment he received at work, and suggests that the Defendant's managers did not take his complaints of discrimination and harassment seriously, misdirected him as to the procedure for the complaints, and altogether discouraged him from complaining.

(a)    *Racial Discrimination*

Under the direct method of prima facie case, the direct evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus." *Radue v. Kimberly-Clark Corp*., 219 F.3d 612, 616 (7th Cir. 2000). Because such admissions are rare, a plaintiff may also "prevail under the direct method of proof by constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decision-maker.'" *Rhodes v. Ill. Dept. of Transp*., 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994); *but see Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 903–04 (7th Cir. 2006) (clarifying that circumstantial evidence need not have a mosaic-like character to preclude summary judgment, but need only allow the trier of fact to infer intentional discrimination by the decision maker). This circumstantial evidence "must point directly to a discriminatory reason for the employer's action." *Jordan v. City of Gary*, 396 F.3d 825, 832 (7th Cir. 2005).

The Seventh Circuit has recognized three kinds of circumstantial evidence of intentional discrimination: (1) "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn"; (2) "evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment"; and (3) "evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a

person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief." *Troupe*, 20 F.3d at 736.

To show racial discrimination, the Plaintiff must first identify the adverse employment action he suffered. The Plaintiff implies that frequent work evaluations and written warnings, along with his eventual firing, were such actions. The Plaintiff is only partially correct: although work termination is an adverse employment action, frequent evaluations and warning letters are not. *See Ezell v. Potter*, 400 F.3d 1041, 1049 (7th Cir. 2005) ("[A] letter of warning is generally considered insufficient to qualify as an adverse employment action."). Accordingly, the Plaintiff's claims that he experienced racial discrimination through work evaluations and warnings are without merit. The Plaintiff's only colorable claim of disparate treatment is his firing. Here, the Court looks for evidence that would allow a rational jury to infer intentional discrimination by the decision-maker.

The Plaintiff presented no such evidence. Instead, he relies on allegations stated in the Complaint. That, of course, is insufficient to overcome summary judgment, *see* Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994), *Haywood v. N. Am. Van Lines, Inc.*, 121 F.3d 1066, 1071 (7th Cir. 1997), especially in light of evidence that the Plaintiff had never heard anyone make racial comments at work, with the exception of one incident when an employee criticized Mexicans. Moreover, in all his briefs, the Plaintiff clumps the discrimination and retaliation claims as if they are the same. (*See* Pl. Resp. at 15–18; Pl. Surresponse at 2–5.) By doing so, and by focusing on the elements of retaliation, not discrimination, the Plaintiff has ignored the factors necessary for showing racial discrimination. Regarding the discrimination claim, the Plaintiff only proposes that the Court should disbelieve

the Defendant's stated reason for his firing—insubordination and intimidation of
employees—and presume that racial intolerance was the real cause. This is a far cry from what
the jurisprudence in the Seventh Circuit requires, *see Troupe*, 20 F.3d at 736 (listing ways to
establish a prima facie case of racial discrimination); *see also see Parker*, 741 F.2d at 980 ("The
district court is not required to evaluate every *conceivable* inference which can be drawn from
evidentiary matter, but only reasonable ones."), and the Court has no choice but to grant
summary judgment for the Defendant as to the Plaintiff's claim of racial discrimination.


(b)      *Racial Harassment*

The Plaintiff maintains that the Defendant subjected him to a racially hostile work
environment by treating him "more harshly than Caucasian employees regarding the
enforcement of Defendant's policies." (Pl. Resp. at 16.) Also, according to the Plaintiff, being
excluded from the pizza lunch was hostile treatment grounded in racial discrimination. As with
racial discrimination claim, the Plaintiff suggests that he has direct circumstantial evidence of
racial harassment at work.

An employer will be liable for racial harassment "[w]hen the workplace is permeated
with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to
alter the conditions of the victim's employment and create an abusive working environment."
*Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 ( 1993) (internal quotations and citations omitted).
To prevail on his racial harassment claim, the Plaintiff must demonstrate four things: "(1) he was
subjected to unwelcome harassment, (2) the harassment was based on his race, (3) the
harassment was severe and pervasive enough to alter the conditions of his environment and

create a hostile and abusive working environment, and (4) there is a basis for employer liability." *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005). "Factors that may be considered in deciding whether the environment is hostile or abusive 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691–692 (7th Cir. 2005) (citing *Harris*, 510 U.S. at 23).

> While it is true that harassment need not be explicitly racial in order to be probative of a hostile environment, it is equally true that not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority. Rather, we have held that the alleged harassment must be "sufficiently connected to race" before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race.

*Beamon*, 411 F.3d at 863–64 (citations omitted).

The Plaintiff's accusations of racial harassment are not based on racial remarks or other offensive utterings. In fact, he has acknowledged that, during his employment for the Defendant, he has never heard anyone make racial comments to him or anyone else, with the exception of a single employee who once disparaged Mexicans. Rather, a heading he used in his Response to the Motion for Summary Judgment—*Racial Harassment Through Micromanagement*—best summarizes his harassment claim. (Pl. Resp. at 3.) The Plaintiff proposes that the Defendant scrutinized his work more than it did the work of the white employees and that it punished him more severely than the white employees. According to him, this was the Defendant's way to harass him because of his race and the connection between the reviews and the race is immediately apparent.

16

The Plaintiff's argument lacks any supporting evidence. Aside from general allegations, he has not shown that the Defendant reviewed him more often than the white employees or that it punished him more severely than the white employees. The Plaintiff only assumes that his punishments were harsher than those of the white employees. Instead of pointing to evidence of unequal treatment, the Plaintiff suggests that, unless white employees were punished in his presence, their punishments do not count: "Even if Defendant did provide Caucasians with counseling, or disciplinary action, [the Plaintiff] did not see this happening." (Pl. Resp. 16–17.) The absence of evidence that white employees received better treatment dooms the Plaintiff's racial harassment claim. *See Troupe*, 20 F.3d at 736 (a plaintiff may raise an issue of fact through "evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic . . . on which an employer is forbidden to base a difference in treatment received systematically better treatment"). Also, the Defendant submitted evidence to the contrary—that white employees who committed the same infractions as the Plaintiff were punished the same as, or harsher than, the Plaintiff. (*See* Def. Statement of Undisputed Material Facts at 8–9, 18–20; DE 24.)

This means that, even if the Plaintiff subjectively perceived the Defendant's discipline as racial harassment, his claim fails nevertheless, for he cannot objectively demonstrate that the Defendant's conduct was in fact motivated by his race. "There is no inherently racial component to an employer providing an employee with a critical (even an unfairly critical) performance review." *Beamon*, 411 F.3d at 864. Indeed, "not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority. Rather, we have held that the alleged harassment must be 'sufficiently

connected to race.'" *Id.*; *see also Lucki v. Ameritech Corp.*, 389 F.3d 708, 713–14 (7th Cir. 2004)

(noting that conduct must have racial character or purpose to support hostile work environment

claim); *Hardin v. S.C. Johnson & Sons, Inc.*, 167 F.3d 340 (7th Cir. 1999) (analyzing whether

remarks had discriminatory character). The Plaintiff has presented no such connection, and the

Court must grant summary judgment to the Defendant as to his racial harassment claim.[4]


**(2)    *The Plaintiff's Retaliation Claim***

The Plaintiff claims that "on multiple occasions, he complained to the Defendant of being

subjected to racially discriminatory and/or harassing conduct by the Defendant, and that because

of one or more of these complaints, which were protected activities, the Defendant fired him,

following his complaint about a pizza lunch." (Pl. Resp. at 12–13.) Although the Plaintiff speaks

of multiple occasions," he singles out only three complaints: the March 2005 EEOC charge, his

September 2005 letter to the Defendant, and his undated letter to the Defendant written sometime

after March 9, 2005. The Plaintiff does not claim that his complaint about being excluded from

---

[4]As noted above, the Plaintiff alleges that the Defendant's managers did not take his complaints seriously, purposefully confused him how the complaints should be filed, and altogether discouraged him from complaining. The Plaintiff has presented no basis for these allegations.

For instance, the Plaintiff cites to his exhibit 14 ( minutes from the November 16, 2005, meeting), pages 2–3, as an example that a "supervisor made it clear he did not want to hear complaints of racial discrimination at all." (Pl. Resp. at 17.) However, a common sense reading of exhibit 14 shows that the supervisor was admonishing him for disturbing the workplace, not telling him that he did not want to hear complaints of racial discrimination.

The same is true of how the Plaintiff characterizes the meeting Vergara had with all the employees after the November 11 pizza lunch. The Plaintiff submits that the purpose of the meeting was to let him know that he should not complain about racism to the management. (*See* Pl. Resp. at 7.) However, nothing in the record supports such inference. Rather, the evidence shows that Vergara called the meeting to stop the Plaintiff from provoking the employees by references to pizza and accusations of racism.

One more example: citing his exhibit 25 (minutes from the August 12, 2003, meeting), the Plaintiff indicates that the management "chewed him out for complaining," told him not to complain to the supervisors again, and told him that he had no basis to claim that he was being harassed. (Pl. Resp. at 4.) Again, a review of exhibit 25 reveals just the contrary: the managers were concerned about the Plaintiff's complaints, they wanted to have an investigation, and only at the insistence of the Plaintiff, no investigation was conducted. Furthermore, the meeting ended with a clear agreement that the Plaintiff would let the management know if he ever felt racial hostility or discrimination.

the pizza lunch and his subsequent actions were protected activities, giving rise to his retaliation claim.

Rather, the Plaintiff believes that, on the basis of these complaints, "a reasonable inference can be made that by November 2005, the Defendant was looking for any excuse it could cook up to fire [him]." (Pl. Resp. at 13.) According to him, the Defendant's explanation that he was fired for harassing and intimidating other employees and failing to stop such conduct when told so is an irrational explanation, suggesting but one reason for why he was terminated: retaliation. The Plaintiff discounts his post-pizza lunch actions as innocuous and that his references to pizza were harmless. He submits that "the only harsh statement alleged" was uttered "*only [in] a whisper*" (*Id.* at 14.). The Plaintiff believes that his conduct did not violate the Defendant's anti-harassment policy so as to subject him to any penalties.

As with his other claims, the Plaintiff has chosen to establish a prima facie case under the direct method. Therefore, he "must present direct evidence of (1) a statutorily protected activity; (2) an adverse employment action taken by the employer; and (3) a causal connection between the two." *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1031 (7th Cir. 2004) (emphasis removed). The Plaintiff bears the burden to "offer circumstantial evidence sufficient to provide a basis for drawing an inference of intentional discrimination. That is, we must be able to infer from the evidence that [the Plaintiff] was discharged . . . in retaliation for complaining of racial harassment." *Logan v. Kautex Textron N. Am.*, 259 F.3d 635, 638–39 (7th Cir. 2001) (citation omitted); *see also Treadwell v. Office of Ill. Sec'y of State* 455 F.3d 778, 781 (7th Cir. 2006) (the plaintiff "bears the burden of coming forward with properly supported arguments or evidence to show the existence of a genuine issue of material fact"). A plaintiff cannot avoid summary

judgment by speculating as to the employer's state of mind. *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003).

The parties do not dispute that the Plaintiff's firing constituted an adverse employment action. Thus, the Court only need to consider whether the Plaintiff engaged in any statutorily protected activity and, if so, whether he was fired as a result of that.

The Plaintiff's complaint about being excluded from eating pizza with Millet, Kleifgen, and McCoy was not a statutorily protected activity as he did not allege any racial disparity or any other statutory violation. (*See* Chapman Dep. at 119.) Instead, he complained of being frustrated that they were not working as a team: "Rick, I thought we were supposed to be a team. I don't understand why the guys want to order pizzas separately and don't include everybody, don't include the team." (*Id.*). Complaining about the management style or how a factory is run is not a protected activity and cannot be a basis for a § 1981 retaliation claim.

On the other hand, since the Plaintiff's April 2005 EEOC charge and the two letters to the Defendant did complain of discrimination, they were statutorily protected activities. Nevertheless, the Plaintiff cannot prevail on his retaliation claim because he has presented no evidence from which a reasonable jury could infer that the charge and the letters were causally connected to his firing.

The Plaintiff believes that there is a sufficient temporal nexus between the EEOC charge, the letters, and his termination. "However, in order to support an inference of retaliatory motive, the termination must have occurred 'fairly soon after the employee's protected expression.'" *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1009–10 (7th Cir. 2000) (quoting *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir.1998)). "Fairly soon" is limited to days, not

weeks or months. *See King v. Preferred Tech. Group*, 166 F.3d 887, 893 (reasoning that temporal proximity created an issue of fact where the plaintiff's termination occurred one day after she finished her FMLA leave); *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 407 (7th Cir. 2007) (noting suspicious timing when an employee fired one week after he complained of discriminatory practices). But in any case, "mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue." *Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002). "The mere fact that one event preceded another does nothing to prove that the first event caused the second. Rather, other circumstances must also be present which reasonably suggest that the two events are somehow related to one another." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) (citation omitted). This is even more so when an intervening event between the protected activity and the adverse employment action exists. *Cf. Moser v. Ind. Dep't of Corrections*, 406 F.3d 895, 905 (7th Cir. 2005) (finding no suggestion of causal link between protected activity and adverse employment action where "numerous incidents brought [the plaintiff's] professionalism and ability to serve as an affirmative action coordinator into question").

The Plaintiff filed the EEOC charge eight months and wrote at least one of the letters two months before he was fired on November 21, 2005. Meanwhile, an intervening event occurred, giving rise to an investigation into the Plaintiff's conduct: on November 11, Vergara began receiving complaints from the Plaintiff's coworkers that he was harassing them over being excluded from pizza lunch and accusing them of racism. In response to these complaints, Vergara called a meeting of all employees and told them to stop talking about pizza and stop

making racial allegations to each other. Although Vergara did not single out any one employee, it is clear that his comments were directed to the Plaintiff's behavior.

However, despite this admonition, the next day, the Plaintiff's coworkers complained again that he continued provoking and harassing them. They alleged that the Plaintiff whispered menacingly into Kleifgen an accusation of racism and told Kleifgen that Kleifgen did not need his help because Kleifgen's job was a "white thing." Langdon told Vergara that the Plaintiff called Kleifgen and Millet racists. McCoy complained to Vergara that the Plaintiff was trying to provoke him on November 13. Heggen investigated and confirmed these complaints. Also, on November 16, Heggen along with James, Foster, and Ellis met with the Plaintiff regarding the accusations against him. Sometime after the meeting, Heggen, James, and Bortner jointly decided that the Plaintiff's continuing harassment and intimidation of workers, even after he was told to stop, warranted termination from employment.

The Plaintiff submits no evidence to challenge the sincerity of their determination. After all, the issue is not whether they reached a correct conclusion, but whether they truly believed that the Plaintiff was insubordinate and acted contrary to the company rules. *Essex v. United Parcel Service, Inc.*, 111 F.3d 1304, 1310 (7th Cir. 1997) ("The fact that the employer was mistaken or based its decision on bad policy, or even just plain stupidity, goes nowhere as evidence that the proffered explanation is pretextual."). Instead, the Plaintiff only speculates as to whether the Defendant would have terminated his employment but for the EEOC charge and the letters to the Defendant. Without more, these complaints are too remote for a temporal nexus, *cf. Sauzek*, 202 F.3d at 919 (without evidence that connects adverse employment action to the EEOC charges filed three months earlier, one cannot reasonably conclude that the two events

22

causally relate to each other), and are insufficient to carry the case to trial.[5]

On a final note, even if the Plaintiff perceived his exclusion from pizza lunch as an instance of hostile work environment, which he then decided to protest, his claim for retaliation would nevertheless be not actionable. "[W]hen an employee engaged in opposition to a perceived unlawful employment practice participates in conduct which does not further the protest, but hinders another person's ability to perform his job, that employee relinquishes statutory protection." *Jennings v. Tinley Park Comm. Consol. Sch. Dist. 146*, 864 F.2d 1368, (7th Cir. 1988). On August 12, 2003, the Plaintiff was told, and he stated that he understood, that he should bring complaints of racial harassment or discrimination to the management. This was a reasonable request as accusations of racism can be volatile.[6] However, the Plaintiff chose to take his frustrations to the employees themselves, but in the process disturbed the workplace and created tension. His coworkers perceived his actions as provocative and complained to their management, which in turn found the complaints credible and worthy of the Plaintiff's termination. The Plaintiff has presented no evidence that the true reason for termination was retaliatory animus and not his harassing and disruptive conduct. Therefore, the Court will grant summary judgment for the Defendant on the Plaintiff's retaliation claim.

---

[5]Without legal authority, the Plaintiff also argues that the November 3 right-to-sue letter constituted a protected activity, and that an inference of retaliation can be drawn from the temporal proximity between the date of the letter and his firing. This argument has no merit. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting the "utterly implausible suggestion that the EEOC's issuance of a right-to-sue letter—an action in which the employee takes no part—is a protected activity of the employee") (per curiam).

[6]In his sur-response the Plaintiff states that, before he was terminated, Vergara ordered him "not to talk about race/racism during a meeting." (Pl. Sur-Response at 3.) He insists that this statement is supported by citations to his own deposition. Despite this claim, the Court could not find any such citation in his briefs. Moreover, having read the included excerpts of the Plaintiff's deposition, the Court can find no passage in support of such assertion.

**E.      Conclusion**

      In response to the Defendant's motion for summary judgment, the Plaintiff has chosen

the direct method to establish material issues of fact as to all of his claims. Instead, he provided

the Court only with conclusory allegations, insufficient to preclude summary judgment.

Accordingly, the Court grants the Defendant's Motion for Summary Judgment [DE 22]. The

Clerk will enter judgment in favor of the Defendant and against the Plaintiff.

      SO ORDERED on June 29, 2007.


                                    ___S/ Theresa L. Springmann_____
                                    THERESA L. SPRINGMANN
                                    UNITED STATES DISTRICT COURT